UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:                                                                      Chapter 11

       300 Washington Street LLC                           Case No. 1-13-43089-nhl

                   Debtor.
----------------------------------------------------------X

## DECISION ON OBJECTION TO CLAIMS AND
## MOTION TO DISMISS OR LIFT THE AUTOMATIC STAY

APPEARANCES:

Isaac Nutovic, Esq.                                    Shannon Marie Jones, Esq.
Nutovic & Associates                                  Assistant Corporation Counsel
261 Madison Avenue, 26th Floor                    233 E. Washington Street
New York, NY 10016                                  Syracuse, NY 13202
*Attorney for the Debtor*                             *Attorney for City of Syracuse*

                                        Clifford Tsan, Esq.
                                        Joseph Zagraniczny, Esq.
                                        Thomas L. Kennedy, Esq.
                                        Bond, Schoeneck & King, PLLC
                                        One Lincoln Center, 18th Floor
                                        Syracuse, NY 13202
                                        *Attorneys for City of Syracuse*

## NANCY HERSHEY LORD
## UNITED STATES BANKRUPTCY JUDGE

     Before this Court is the contested motion of the City of Syracuse (the "City") seeking

dismissal of the chapter 11 case of 300 Washington Street LLC (the "Debtor") or, alternatively,

relief from the automatic stay so that the City may foreclose against the Debtor's asset, a vacant

building in downtown Syracuse, New York (the "Property"), on account of delinquent real estate

tax indebtedness.  Also to be determined is the Debtor's objection to allowance of the City's

1

filed proofs of claim and the ability of the City to make a Bankruptcy Code § 1111(b) election on account of its largest claim.  For the reasons set forth herein, the Court (1) finds in favor of the Debtor on the issues of dismissal and stay relief; (2) disallows the City's claim for *ad valorem* taxes in excess of the City's $595,000 appraised value of the Property; (3) determines that the City may not elect to treat its claim for *ad valorem* taxes as fully secured pursuant to § 1111(b); and (4) overrules the Debtor's objection as to the City's claims that do not constitute *ad valorem* real property taxes, without prejudice to the right of the Debtor to seek disallowance or reduction of said claims on other grounds.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

On May 21, 2013, the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On June 18, 2013, the City moved to dismiss the case under 11 U.S.C. § 1112(b), or in the alternative, to lift the automatic stay under 11 U.S.C. § 362(d)(1) and (2).[1]  The Debtor opposes the City's motion, and also objects to the eight proofs of claim filed by the City, numbers 3–10 on the claims register.  The Debtor requests that the Court void the portion of the claims that exceed the City's appraised value of the Property, pursuant to

---

[1] The City subsequently made a second motion to dismiss, in which it elaborated on its previous arguments. Mot. to Dismiss, ECF No. 56.  The City also filed a brief in further support of its motion to dismiss, in which § 362(d)(3) was included as an additional basis for lifting the automatic stay. Brief, ECF No. 129.

11 U.S.C. § 502(b)(3). The City argues that its *ad valorem* tax claim is not limited to the value of the Property and should be allowed in full, and that its other claims are not in the nature of *ad valorem* taxes. Alternatively, the City asserts that it may elect to treat its *ad valorem* tax claim as fully secured under 11 U.S.C § 1111(b).

The Court held an evidentiary hearing and, over the course of three days, heard the testimony of Isaac Jacobowitz, the Debtor's principal; Berl Jacobowitz, a former principal of the Debtor; Abraham Grunbaum, principal of lender Capitol Holdings USA, LLC ("Capitol"); Martin Spitzer, the Debtor's only employee; and Ben Walsh, Deputy Commissioner of the Department of Neighborhood and Business Development for the City. Following closing arguments, the parties each submitted proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

Original members Isaac and Berl Jacobowitz formed the Debtor for the purpose of acquiring, developing, and holding the Property, located at 300 East Washington Street, Syracuse, New York.[2] The Debtor purchased the Property in 2006 for $3.5 million. Purchase Agreement Ex. 13; Trial Tr. 48–49, Nov. 6, 2013, ECF No. 124; City's Pretrial Statement 5, ECF No. 111. At the time of purchase, the Property was subject to tax arrears in the amount of $900,000. Trial Tr. 48, Nov. 6, 2013. Carnegie Management contributed the down payment on the Property. Carnegie Management, a Brooklyn-based entity co-owned by Isaac and Berl Jacobowitz, manages several properties in the New York City area. It has paid substantially all of the Debtor's operating expenses since the Debtor acquired the Property.

---

[2] Presently, Isaac owns 1% of the Debtor, and Brooklyn Equity Holdings, LLC, an entity solely owned by Isaac, owns 99% of the Debtor.

Capitol, an entity formerly owned by the Jacobowitzes, provided the Debtor with approximately $2.7 million to finance the purchase.[3] Note Ex. 16, at 1; Modification and Extension Agreement Ex. 17, at 1; City's Pretrial Statement 1.  Although the Debtor never made payments on the loan, Capitol did not initiate foreclosure proceedings.  Instead, Capitol operates with the understanding that the Debtor will begin making payments after it completes development of the Property and begins generating income. *Id*. at 20, 71.

Before the Debtor finalized the purchase, its principals met with City officials to discuss the Syracuse real estate market and plans to develop the Property. Trial Tr. 138, Nov. 18, 2013, ECF No. 135.  The City expressed interest in leasing office space in the Property, which is located across the street from City Hall, and provided specifications, including required cost and square footage. *Id*. at 138, 143–44 (referencing email from the City's Head of Econ. Dev. to the Mayor Ex. 41, regarding his meeting with the Jacobowitzes), 148.  The Debtor hired professionals and expended approximately $250,000 to generate a proposal responsive to the City's needs, including reduced energy costs. *Id*. at 147–48, 151–52, 158, 160–61; Email from the City's Head of Econ. Dev. to the Mayor Ex. 41.  Between 2006 and 2008, the Debtor's local counsel continued lease negotiations with the City and periodically reported back to the Debtor. *Id*. at 149.

Shortly after acquiring the Property, the Debtor instituted a tax certiorari proceeding to challenge the $1.5 million discrepancy between the purchase price and the City's $5 million tax valuation. *Id*. at 148–49;173–74; Debtor's Pretrial Statement 3.  The Debtor also obtained approval from the State to participate in the New York State Empire Zone Program, which,

---

[3] At the time of the purchase and loan, Isaac held 50% of the Debtor and 5% of Capitol; Berl held 50% of the Debtor and 95% of Capitol.  In 2012, Berl transferred his interest in the Debtor to Isaac, in exchange for Isaac's interest in Capitol. *Id*. at 6.  Shortly thereafter, Berl transferred his 100% ownership interest in Capitol to Abraham Grunbaum. *Id*.

subject to the City's consent, would offer the Debtor benefits such as tax reimbursement.[4] Trial

Tr. 169, Nov. 18, 2013; Trial Tr. 19, Feb. 24, 2014, ECF No. 164.

While the certiorari proceeding was pending, the City conditioned its continued

participation in lease negotiations and approval of the Empire Zone certification on the Debtor's

entrance into a tax trust agreement. Trial Tr. at 169, 172, 179, Nov. 18, 2013; Ex. 40, at 1.  Under

the agreement, the Debtor would stipulate to a $3.5 million tax assessment. Settlement Ex. G;

Trial Tr. 170–72, 179, Nov. 18, 2013.  Initially, City officials assured the Debtor that the

settlement would not preclude a further reduction in the assessment if the Debtor prevailed in the

tax certiorari proceeding. Trial Tr. 170–71, Nov. 18, 2013; Letters from Dep't. of Assessment

and Dep't. of Fin. to Debtor's Syracuse Counsel Ex. 40, at 2–3.  However, three months later, the

City's First Deputy Commissioner of Finance told the Debtor that in order to enter into the tax

trust agreement, the Debtor was, in fact, required to dismiss its tax certiorari proceedings.  The

City would not execute the agreement "unless and until the pending Certiorari proceedings are

settled . . . ." Trial Tr. 171, Nov. 18, 2013; Ex. 40, at 4.  Thus, in order to continue lease

negotiations with the City and obtain its sign-off on the Empire Zone program, both crucial

components of the Debtor's plans to develop the Property, the Debtor dismissed the tax certiorari

proceeding in March of 2009 and thus acquiesced to a $3.5 million tax assessment. *Id*. at 174.

In 2010, the City elected a new mayor.  The Debtor attempted to engage the newly

appointed administration in continued negotiations. Trial Tr. 160, Nov. 18, 2013.  The Debtor's

principals met with Ben Walsh, who now served as the City's Deputy Commissioner of the

Department of Neighborhood and Business Development.  The Jacobowitzes testified that the

---

[4] Under the Empire Zone statute, "[r]eal property constructed, altered, installed or improved in an area designated an empire zone pursuant to article eighteen-B of the general municipal law shall be exempt from taxation and special ad valorem levies by any municipal corporation in which located, for the period and to the extent herein provided, provided that the governing board of such municipal corporation, after public hearing, adopts a local law, ordinance or resolution providing therefor." N.Y. RPTL § 485-e(1)(a) (McKinney's).

tenor of their first meeting was overwhelmingly negative. *Id*. at 162; Trial Tr. 86–89, Nov. 6, 2013.  Mr. Walsh reportedly indicated to the Jacobowitzes that the City's real estate market was ill-suited for a large downtown office building. Trial Tr. 162, Nov. 18, 2013.  Mr. Walsh also expressed that the City did not intend to lease space in the Property. *Id*.

In response, the Debtor began soliciting other tenants and formulating plans to develop the Property for residential use. *Id*. at 164–65.  Isaac Jacobowitz testified that the previous administration encouraged the Debtor to consider residential development, given the demand for downtown housing. *Id*. at 166.  Mr. Walsh, however, told the Debtor's principals that the market was not right for residential development either. Trial Tr. 88–89, Nov. 6, 2013.

The Debtor attempted to negotiate a resolution with the City as to the outstanding tax debt on the Property.  Isaac Jacobowitz testified that in a meeting with Mr. Walsh, the Debtor offered to pay $800,000 of the $1.4 million tax debt and to invest $1 million into the Property.[5] *Id*. at 66–67, 167–68.  The City rejected this settlement. *Id*. at 68.  According to Mr. Walsh, as a matter of policy the City does not compromise on tax debt, and he opined that the City would reject a hypothetical offer to pay $1.1 million on a $1.2 million tax obligation. *Id*. at 68–69, 122. In the year between the Jacobowitzes' first meeting with Mr. Walsh in the spring of 2010, and their second meeting in May of 2011, the Debtor defaulted under the tax trust agreement. *Id*. at 208-09.

Mr. Walsh testified to meeting with the Debtor's Syracuse counsel, but does not remember ever meeting with the Jacobowitzes.[6] *Id*. at 63–64.  Although he was aware that the

---

[5] Isaac Jacobowitz testified that this was just one of the many offers the Debtor made to the City regarding settlement of its unpaid taxes. Trial Tr. 135, Nov. 18, 2013.

[6] Both Berl and Isaac Jacobowitz testified as to at least two face-to-face meetings with Ben Walsh. Trial Tr. 161, Nov. 18, 2013; Trial Tr. 86–88, Nov. 6, 2013.

City kept records on the Property and on its prior negotiations with the Jacobowitzes, Mr. Walsh does not recall ever reviewing the file. *Id*. at 63–64.  Furthermore, Mr. Walsh does not recollect consulting his predecessors on their negotiations with, or impressions of, the Jacobowitzes. *Id*. at 65.

In communications between City officials, Mr. Walsh wrote, "I think we are all on the same page in terms of our reservations about doing <u>anything</u> with the current owners." Walsh Emails Ex. 44, at 10.  He also stated that "it's probably not in the City's best interest to work with these guys . . . I would recommend we move forward with a seizure/sale since we know we have capable local developers interested in the property." *Id*. at 9.  Isaac Jacobowitz testified that Mr. Walsh subsequently refused repeated requests to meet with the Debtor's principals. Trial Tr. 180, Nov. 18, 2013.

The tax forfeiture process began when the City deemed the Property tax delinquent and seizable, and listed the Property on its website along with other properties on which the public could bid. *Id*. at 19-20.  On December 4, 2012, the Pemco Group ("Pemco") offered the City $100,000 for the Property. *Id*. at 25; Pemco Bid Ex. 20.  Pemco, a local developer, owns the building adjacent to the Property. Trial Tr. 71, Nov. 18, 2013.  The following day, December 5, 2012, the City sent a notice to the Debtor advising it of Pemco's offer and providing that the Debtor had sixty days to pay the delinquent amount of $1,770,556.21 in order to redeem and avoid seizure of the Property. *Id*. at 25–26; Affirmation Ex. J, ECF No. 22.

On January 17, 2013, Alfred Weissman Real Estate, LLC ("Weissman") offered the City $550,000 for the Property.[7] Trial Tr. 26–27, Nov. 18, 2013; Weissman Bid Ex. 22.  On April 15, 2013, the City conducted an appraisal of the Property which calculated a fair market value of

---

[7] Weissman has completed multiple development projects in Binghamton, New York. Trial Tr. 114–15, Nov. 18, 2013.  Mr. Walsh received information from his counterpart in Binghamton that Weisman is a capable developer who performed well in the region. Trial Tr. 26–27, Nov. 18, 2013.

$595,000, almost three million dollars less than the Debtor's purchase price, and 17% of the assessed value. *Id.* at 29–30; Appraisal Ex. 29. Accordingly, both bidders were required to increase their offers to $595,000. Trial Tr. 31, 38, 41–42, Nov. 18, 2013; Walsh Email Ex. 45. The $595,000 bids represented the full amount of the bidders' proposed purchase price, and the bidders were not required to pay any of the outstanding taxes on the property.[8]

When multiple parties express interest in a property, the City generally conducts a sealed bid auction and awards the property to the highest bidder. *Id.* at 32. For this sale, however, the City devised a qualitative review process to select the project it deemed best for the community, rather than the highest bid. *Id.* It did not choose to solicit projects through the issuance of a request for proposal ("RFP"). *Id.* at 32, 33. Although an RFP could have generated more bids on the Property, the City did not want to invite out-of-town real estate speculators.[9] *Id.* at 35. Mr. Walsh testified that "the City of Syracuse has been victimized by real estate speculators," *Id.* at 106, and that he considers the Jacobowitzes to be speculators, *Id.* at 63.

The City created a special committee, which analyzed the two offers based on scoring criteria of: proposed development, project financials, proposer qualifications, expected public benefit, and proposed purchase price. Walsh Email to Mayor Ex. 25; *Id.* at 37–38. City staff raised several concerns about Pemco's offer. Pemco provided no proof of financing for the purchase, and only weak support for its ability to fund a proposed ten year budget. Application Review Ex. 38, at 4. Mr. Walsh's department also noted multiple open code violations at Pemco's other building on Washington Street. *Id.*

---

[8] A third party, 300 E. Washington Street, LLC, also expressed interest in developing the Property, but only submitted an incomplete proposal and ultimately withdrew its application. Walsh Email Ex. 45.

[9] Mr. Walsh also asserted that another reason the City refrained from issuing an RFP was its uncertainty that the City's appraiser could have accessed the interior of the Property to compile sufficient information for potential purchasers. Trial Tr. 33–34, Nov. 18, 2013. Nevertheless, according to Mr. Walsh's prior testimony, corroborated by the Debtor, the City had access to the Property and Mr. Walsh could obtain entry "at any time." City Employee Emails Ex. 36. Trial Tr. 29, 183–84, Nov. 18, 2013.

Ultimately, the committee designated Pemco as the preferred developer, and the City selected Pemco's bid. Walsh Email to Mayor Ex. 25. The Debtor filed its bankruptcy petition to prevent the impending sale.

## DISCUSSION

### A.  THE AMOUNT OF THE CITY'S CLAIM

Section 502(b)(3)

Many questions in this case turn on the value of the City's claim. Section 502(b)(3) provides in pertinent part that a court "shall allow such claim in such amount, except to the extent that—(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property." 11 U.S.C. § 502(b)(3). The plain language of the statute disallows a claim for property taxes to the extent it is unsecured. *See In re Universal Seismic Associates, Inc.*, 288 F.3d 205, 208 (5th Cir. 2002) (holding that, under § 502(b)(3), taxing authorities could not claim more than the value of the debtor's interest in the property); *see also In re First Magnus Financial Corp*., 415 B.R. 416, 427-28 (Bankr. D. Ariz. 2009) ("The effect of § 502(b)(3) is to eliminate all unsecured prepetition tax claims that might otherwise obtain priority under § 507(a)(8)(B). A claim disallowed under § 502(b)(3) is disallowed for all purposes.); *In re Precision Concepts, Inc*., 305 B.R. 438, 442 (Bankr. M.D.N.C. 2004).

The City, however, argues that it may assert a deficiency claim to the extent its tax claim is unsecured. Response to Objection to Claims 3–10, Sept. 23, 2013, ECF No. 65. It argues that the Court should disregard the plain meaning of the statute, as it would "produce a result demonstrably at odds with the intentions of its drafters." *Id*. at 4 (*quoting U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 243 (1989)); *In re NVF Co.*, 394 B.R. 33 (Bankr. Del. 2008).

In drafting § 502(b)(3), the legislature intended to "prevent a windfall to mortgagees and other lienors," and to "prevent an injustice to unsecured creditors." *In re NVF Co.*, 394 B.R. at 40 (*quoting* 4 COLLIER at ¶ 502.03 [4] [a]) (internal citations omitted). If the Bankruptcy Code allowed the unsecured portion of tax claims, taxes that resulted in liens on the property, which may be owed by the Debtor personally, would be paid by the estate, even if the property had no value to the estate. *Id.* Such a payment by the estate to the taxing authority would inure only to the benefit of a mortgagee or successor owner, who would be relieved of the tax liens on the property. *Id.* Moreover, the allowance of a large unsecured portion of a tax claim would prejudice unsecured creditors included in the same class, whose claims would be diluted. *Id.*; *In re BH S & B Holdings LLC*, 435 B.R. 153, 161 n.8 (Bankr. S.D.N.Y. 2010).

Some courts have looked to statutory intent to inform an equitable result in situations where a debtor abandons valueless or burdensome property. The City primarily relies on *In re NVF* to argue that § 502(b)(3) should not apply to its claims. In *In re NVF*, the debtor owed approximately $1.5 million in real estate taxes and approximately $220,000 in unpaid utility charges, both secured by the debtor's mill. *In re NVF*, 394 B.R. at 35. The dilapidated building was significantly damaged by fire and environmental contamination. *Id.* at 38. The debtor abandoned the property. *Id.* at 40. The Delaware bankruptcy court, presented with a rare case in which a strict application of § 502(b)(3) would produce a result that was at odds with the legislative intent, declined to follow the statute's plain meaning. *Id.* at 38. Specifically, the court found that the drafters of § 502(b)(3) did not envision the unique scenario in *NVF*. *Id.* at 41. Due to demolition and hazardous waste cleanup costs, the property had negative market value and no potential purchasers. *Id.* at 40–41. Therefore, because no party stood to suffer a hardship or gain a windfall, the Court found the plain meaning of § 502(b)(3) inapplicable. *Id.* at 41.

This reasoning does not undermine the plain meaning of § 502(b)(3), as applied in the majority of cases. Presented with facts very similar to the case at bar, the court in *In re Shefa, LLC* declined to apply the *NVF* exception. *In re Shefa, LLC*, 524 B.R. 717 (Bankr. E.D. Mich. 2015). In *Shefa*, the single asset real estate debtor owed substantial tax debt. The county's claims greatly exceeded the assessed value of the property, a vacant building. *Id*. The debtor sought to disallow the portion of the county's tax claims that exceeded the property's value. *Id*. at 728. The county urged the court to look behind the plain meaning of § 502(b)(3). The court found *In re NVF* inapplicable, and voided the unsecured portion of the tax claim, pursuant to § 502(b)(3). *Id*. It distinguished *NVF*, in which a court "declined to apply § 502(b)(3) where the subject property was no longer in the bankruptcy estate," from "the converse situation, where the subject property is still in the bankruptcy estate." *Id*. at 734–35. Moreover, the *Shefa* court noted that, unlike the debtor in *NVF*, Shefa Holdings LLC "proposed to pay in full the appraised value of the subject property against which the tax was assessed." *Id*. at 735.

Here, the City's own appraisal evidences the Property's value. The Property is also marketable. Pemco and Weissman offered to pay market value, notwithstanding the City's refusal to promote competitive bidding through a request for proposals. The City urges this Court to look behind the plain meaning and legislative intent of § 502(b)(3) and allow the City a substantial unsecured claim, but such a result does not accord with the plain language of the statute, or with the vast majority of case law interpreting it. The statute is clear; the Property has value, and § 502(b)(3) protects that value for the benefit of the estate and unsecured creditors. The City's *ad valorem* tax claim is therefore disallowed to the extent that it exceeds the value of the Property.

The Value of the Property

To determine the amount of the City's secured claim, the Court must determine the value of the Property.  Although the value is disputed, the Property is undoubtedly worth less than the full amount of the City's tax claim.  On numerous occasions during this case, the City stated that the Property's value is $595,000, pursuant to its own appraisal.  However, the City now argues that this figure does not bind the City, and it is entitled to revalue the Property to buttress its position in the matters presently before the Court. Hr'g Tr. 17–18, Oct. 8, 2013, ECF No. 91; Sur-Reply to Resp. to Objection to Claim 3, Oct. 7, 2013, ECF No. 81.  The Debtor contends that the Property's value is $595,000, as per the City's appraisal, and judicial estoppel precludes the City from eschewing its original valuation. Hr'g Tr. 4–7, Oct. 8, 2013, ECF No. 91.

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).  It prevents a party from switching to an inconsistent theory to gain a litigation advantage. *Id.* at 749; *Young v. U.S. Dept. of Justice*, 882 F.2d 633, 639 (2d Cir. 1989); *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953).

Judicial estoppel commonly requires a two-part showing.  First, the party to be estopped must have "argued an inconsistent position in a prior proceeding." *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1033 (2d Cir. 1993).  Second, "the prior inconsistent position must have been adopted by the court in some manner." *Id.*  However, the Supreme Court has recognized that there are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *New Hampshire v. Maine*, 532 U.S. at, 751; *see Intellivision v.*

12

*Microsoft Corp.*, 484 Fed.Appx. 616, 619 (2d Cir. 2012); *see also Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982). Thus, a "prior proceeding" could be an earlier matter in the same proceeding or a matter in a prior case. *Republic of Ecuador v. Chevron Corp*, 638 F.3d 384, 395–96 (2d Cir. 2011). Adoption can include adjudication by the court or reliance by another party, the court, or both. *Id* at 395.

For example, in *In re Vaniman Intern., Inc.*, 22 B.R. 166 (Bankr. E.D.N.Y. 1982), the court found that a creditor was judicially estopped from challenging a valuation of the debtor's property, which the creditor adopted in a prior motion, and the court and the other parties relied upon. Early in that case, two creditors sought relief from the automatic stay to foreclose on the debtor's property. *Id*. at 179. The first mortgagee submitted evidence that the value of the property was $360,000, and the second mortgagee requested that the court also apply this valuation to its lift stay motion. *Id*. When the property eventually was sold through the bankruptcy for a much larger amount, the second mortgagee attempted to argue that the prior appraisal undervalued the property. *Id*. The court rejected this reversal in position, stating that "the wholehearted adoption by the [creditors] of the value of $360,000 at the hearing . . . for relief from stay limits their ability now to claim a higher market value." *Id*. at 193–94. Even though the court had not ruled on the property's value in the *Vaniman* case or in a prior case, the court held that the creditor, "having urged when it was to their advantage to do so that [the property] was worth no more than $360,000, [was] now judicially estopped from insisting on a higher value." *Id*.

Here, the City's motion for dismissal or stay relief, filed shortly after the petition, represented that the property is worth $595,000 as evidenced by the City's own appraisal. For example, the City asserted that "[t]he Debtor, by its own admission and based on an appraisal

prepared for the City in contemplation of the seizure and transfer, has no equity in the Subject Property." Affirm. and Ex. to Mot. to Dismiss 15, ECF No. 22 (referring to the City's $595,000 appraisal annexed thereto as Exhibit "L").  Likewise, in its memorandum of law, the City argued that, based on the $595,000 valuation, the Debtor has "no realistic opportunity for any reorganization." Mem. of Law in Supp. of Mot. 18, ECF No. 25.

Three weeks later, the Debtor, relying on the City's valuation, filed its first plan of reorganization, and listed the City's allowed secured claim as $595,000. Plan, ECF No. 32. When the Court held a hearing on August 7, 2013, the City repeatedly stated that the value of the Property is $595,000.  For example, counsel for the City listed the various claims it filed in the case, including "a secured claim in the amount of $595,000, which is the value of the property." Hr'g Tr. 10, Aug. 7, 2013, ECF No. 79.  Counsel for the City also stated that "the debtor has acquiesced that the value of the property is $595,000 as opined in the appraisal submitted to this Court." *Id*. at 15.  At that hearing, the Court likewise referred to the $595,000 valuation several times without objection from the City. *Id*. at 12, 20, 23.

The Debtor subsequently filed its objection to the City's unsecured claim and moved to value the City secured claim at $595,000.  In response, the City suddenly adopted the position that the appraised amount is not the true value of the Property, and a new appraisal is needed.

The Court agrees with the Debtor that judicial estoppel precludes the City from offering a new valuation at this juncture.  Based upon the City's averments in multiple pleadings, exhibits, and statements on the record, the Debtor and the Court proceeded under the assumption that $595,000 is the Property's accurate value.  The Court will not sanction the City's advantageous reversal of position.  Under the doctrine of judicial estoppel, and the equitable power of this

14

Court, the City is estopped from asserting that the Property is worth more than $595,000.

Accordingly, the Court finds that the Property's value is $595,000.

<u>The City's Ability to Make a § 1111(b) Election</u>

Alternatively, the City argues that even if the unsecured portion of its tax claim is disallowed under 11 U.S.C. § 502(b)(3), it may still elect fully secured treatment under 11 U.S.C. § 1111(b).  Section 1111(b)(1) provides in pertinent part:

> (A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . (2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

Section 1111(b) allows a creditor, whose claim is secured by a lien on property of the estate, to treat its entire claim as secured, even if the amount of the claim exceeds the value of the property. *In re Coltex Loop Cent. Three Partners, L.P.*, 138 F.3d 39, 46 (2d Cir. 1998); *In re 680 Fifth Ave. Assocs.*, 29 F.3d 95, 97 (2d Cir. 1994).  Alternatively, the creditor may elect "to have the claim bifurcated into secured and unsecured portions." *In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97.

While § 1111(b) permits an undersecured creditor to choose between treating its allowed deficiency claim as unsecured debt or retaining the full amount of its lien, it does not allow the unsecured portion of a tax claim disallowed by § 502(b)(3). *In re Shefa, LLC*, 524 B.R. at 739 ("[O]nce any amount of the [tax claim] is disallowed pursuant to § 502(b)(3), § 1111(b)(1)(A) does not somehow breathe life back into that amount, whether as a recourse or a non-recourse claim, and whether secured or unsecured").  By ignoring the import of § 502(b)(3), the City misinterprets the scope of § 1111(b).

Section 1111(b)(2) provides that to the extent the claim is allowed, it may be treated as a secured claim, regardless of whether the original debt was recourse or nonrecourse. However, a creditor cannot make an election under § 1111(b) as to a claim that has been disallowed under another section of the Bankruptcy Code. The City's attempted application of § 1111(b) renders § 502(b)(3) a nullity. The City may not resurrect a deficiency claim, disallowed pursuant to § 502(b)(3), by electing wholly secured treatment pursuant to § 1111(b). Thus, to the extent that its tax claims are subject to § 502(b)(3), the City does not have an allowed claim in excess of the Property's value, $595,000.

<u>What Constitutes a "Tax" Under § 502(b)(3)</u>

As previously stated, 11 U.S.C. § 502(b)(3) applies to "tax[es] assessed against property of the estate." Not all charges and fees assessed on a debtor's property by a taxing authority are subject to the provision. Instead, § 502(b)(3) only applies to *ad valorem* taxes, with state law dictating the scope of that term.

The Bankruptcy Code does not define "tax." Guided by legislative intent, courts interpret § 502(b)(3) to "apply only in the context of *ad valorem* tax," and not to other types of taxes and charges. S.Rep. No. 989, 95th Cong., 2d sess. 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849); *In re NVF*, 394 B.R. at 42 (citing the legislative history at H.R.Rep. No. 595, 95th Cong., 1st sess. 353 (1977)); *In re Painter*, No. 7-92-01277, 1994 WL 456508, at *3 (Bankr. W.D. Va. Mar. 31, 1994); *see also In re Pioneer Title Bldg., Ltd.*, 133 B.R. 822 (Bankr. W.D. Tex. 1991) ("[§ 502(b)(3)] mandates disallowance of an *ad valorem* tax on property of the estate for pre-petition tax claims").

An "*ad valorem* tax" is "[a] tax imposed proportionally on the value of something (esp. real property), rather than on its quantity or some other measure." Black's Law Dictionary (10th

ed. 2014).  *Ad valorem* taxes are calculated as a percentage of a property's value. *Id.* (citing 71 Am. Jur. 2d State and Local Taxation § 20, at 355 (1973)).  *Ad valorem* taxes on property are clearly disguisable from other taxes, such as income tax, sales tax, or social security tax, which employ different formulas and variables. 4 COLLIER  at ¶ 502.03[4][b][3].  But other charges assessed on a property, such as water, sewer, gas, and electricity, are not *ad valorum* taxes because they are not determined based on the property's value. *In re NVF*, 394 B.R. at 35, 43.

Of the eight claims filed by the City, Claims No. 3 through 6 are for unpaid water service charges, totaling $3,306.66.  Claim No. 7 is for unpaid sewer charges, totaling $5,462.43.  Claim No. 8 is for charges for other unpaid services to the Property, such as flushing, special lighting, sweeping, and water rent, totaling $15,284.22.  These amounts are based upon services rendered, not upon the value of Property, and are therefore not *ad valorem*.

Claim No. 9 is for unpaid special district charges due to the location of the Property, totaling $86,865.52.  To determine whether this type of charge is an *ad valorem* tax, further analysis is required.

State law determines the scope of *ad valorem* real property taxes, because interests in property "are created and defined by state law." *Butner v. US*, 440 U.S. 48, 55 (1979); *see also Travelers Cas. and Sur. Co. of Am. v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 451 (2007). These state law definitions apply in bankruptcy proceedings, "[u]nless some federal interest requires a different result." *Butner*, 440 U.S. at 55.  The New York Real Property Tax Law defines "tax" as "a charge imposed upon real property by or on behalf of a county, city, town, village or school district for municipal or school district purposes, but does not include a special ad valorem levy or a special assessment." N.Y. RPTL § 102(20) (McKinney's).  A "special assessment" is "a charge imposed upon benefited real property in proportion to the benefit

received by such property to defray the cost, including operation and maintenance, of a special district improvement or service or of a special improvement or service, but does not include a special ad valorem levy." *Id*. at § 102(15).

Claim No. 9 arises from an ordinance pertaining to downtown real estate.  "The City of Syracuse 1988 General Ordinance # 53 created the special assessment district within the City of Syracuse and provided that the properties in the district may be assessed according to a formula, which reflected the benefits accruing to the various properties in the district by reason of the improvements." *In the Matter of the Petition of Elayne Herrick*, No. 822854, 2010 WL 2079899 *6 (N.Y.Div.Tax.Appl May 13, 2010).  In *Herrick*, the State of New York Division of Tax Appeals rejected the petitioner's argument that special district charges imposed under Ordinance # 53 could be deducted from her tax return under a state law permitting tax credits for "eligible real property tax." *Id*.  The court held that Ordinance # 53 was a special assessment, because it entailed "precisely the type of proportional benefit formula" described by RPTL § 102(15). *Id*. Consequently, Proof of Claim No. 9 is not a tax debt, and thus falls outside the scope of § 502(b)(3).

Accordingly, proofs of claim 3, 4, 5, 6, 7, 8, and 9 are not subject to disallowance under § 502(b)(3).  Claim No. 10, a claim for unpaid *ad valorem* real property taxes, totaling $1,883,395.68, falls squarely within the purview of § 502(b)(3).  Claim No. 10 is thus disallowed for amounts in excess of $595,000 (the property valuation), for a total disallowed amount of $1,288,395.68.

B.  THE CITY'S MOTIONS TO DISMISS

Section 1112(b)(4)

The City moved to dismiss the Debtor's case pursuant to 11 U.S.C. § 1112(b) "for cause."  Section 1112(b) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1).  Section 1112(b)(4) lists sixteen nonexclusive examples of "cause," five of which, the City argues, apply to this case:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

11 U.S.C. § 1112(b).  The party seeking dismissal bears the "burden of demonstrating cause by a preponderance of the evidence." *In re GEL, LLC*, 495 B.R. 240, 245 (Bankr. E.D.N.Y. 2012).

Here, the City identifies circumstances it believes are cause for dismissal, such as: (1) a decrease in value of the Property due to the damage caused by a water main break in the building shortly after filing of the petition; (2) the persistent vacancy of the Property since it was purchased by the Debtor in 2006; (3) the Debtor's lack of a viable business; (4) an absence of insurance on the Property; (5) the extreme unlikelihood that the City will consent to a plan proposed by the Debtor; (6) the Debtor's failure to pay the full amount of taxes owed since filing; and (7) the Debtor's failure to timely satisfy filing or reporting requirements.

 As an initial matter, the Debtor provided proof that the Property is insured. Certificate of Liab. Ins., Ex. No. 18.  Thus, subsection (C) does not constitute grounds for dismissal.  Likewise,

subsection (F) does not warrant dismissal because the Debtor files its monthly operating reports and is substantially current with all other administrative requirements.

The City's arguments pursuant to factors (A), (B), and (I) are also unavailing.  In the City's view, the Debtor is an inept real estate speculator who allowed the Property to deteriorate and long avoided its obligation to pay taxes and other charges.  The City asserts that the Debtor lacks the ability or intent to develop the Property.  The Court is unpersuaded.  While the Debtor has endeavored to rehabilitate the Property and pay the tax arrears, the City bears significant responsibility for any loss to or diminution of the estate.  The evidence certainly does not support a finding of "gross mismanagement."

<u>Bad Faith</u>

The City also moves to dismiss the Debtor's case based on its allegation that the Debtor filed its petition in bad faith.  Although not enumerated in 11 U.S.C. § 1112(b), bad faith constitutes cause for dismissal. *In re C-TC 9th Avenue Partnership*, *113* F.3d 1304, 1310 (2d Cir. 1997).  Bankruptcy courts employ their equitable powers to dismiss a case filed in bad faith, as good faith is a well-accepted precondition to bankruptcy relief. *In re 9281 Shore Rd. Owners Corp.*, 187 B.R. 837, 848 (Bankr. E.D.N.Y. 1995).  The City argues that application of the factors set forth in *In re C-TC 9th Avenue Partnership* supports a finding of cause for dismissal. The Court disagrees.  Not only does the City's application of *C-TC 9th Ave.* fail to demonstrate bad faith by the Debtor, but the City is also not entitled to relief on equitable grounds.

*C-TC* listed eight factors for courts to weigh in evaluating whether a filing was in bad faith:

    (1) the debtor has only one asset;
    (2) the debtor has few unsecured creditors whose claims are small in relation to those
       of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997). These factors should "guide courts" in "assessing the totality of the circumstances," and "[d]epending on the situation, one or another factor may have greater weight, and the number of factors on one side or the other of the balance is not, standing alone, determinative of the outcome." *In re Hartford & York LLC*, No. 13–45563, 2014 WL 985449,*4 (Bankr. E.D.N.Y. 2014).

An overarching question is whether "from the date of filing the debtor has no reasonable probability of emerging from the bankruptcy proceeding and no realistic chance of reorganizing." *In re East End Dev., LLC*, 491 B.R. 633, 641 (Bankr. E.D.N.Y. 2014) (*quoting In re C-TC 9th Ave. P'ship*, 113 F.3d at 1310). Even if all, or nearly all, of the *C-TC* factors are arguably present, a debtor may still establish that it has an ability to effectively reorganize. *See e.g., In re 68 W. 127 St., LLC*, 285 B.R. 838 (Bankr. S.D.N.Y. 2002). In the Second Circuit "it is settled that 'dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances.'" *Id.* (*quoting In re Centry/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003)). Bad faith warrants dismissal only "if both objective futility of the reorganization process *and* subjective bad faith in filing the petition are found." *Id.* (*quoting In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).

In this case, based on the totality of the circumstances, the Debtor filed its petition for the valid and viable purpose of reorganizing.  Its reorganization is not objectively futile because it has proposed a potentially confirmable plan.  Although the Debtor, whose only asset is the Property, does not yet produce revenue, its principal is prepared to contribute to a feasible plan.  Furthermore, a successful reorganization is practicable in light of this Court's ruling on the Debtor's objection to claim.  Moreover, the Court finds that the Debtor's petition was not subjectively filed in bad faith.  No evidence heard by this Court persuaded it that the Debtor intends to use the bankruptcy for any purpose other than reorganization.  The foregoing considerations support a finding that the Debtor has a reasonable probability of emerging from bankruptcy.  Therefore, based on the entire record, the Court is convinced that the Debtor filed its petition in good faith.

Furthermore, the City's actions leading up to the bankruptcy suggest that it would be inappropriate for this Court to use its equitable powers to grant the motion to dismiss the Debtor's case as a bad-faith filing.  It is "well-established that a litigant who seeks equity must do equity." *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir. 2003); *see also Precision Instruments Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 814 (1945) (requiring a party seeking equitable remedies to "come with clean hands").  Arguably, throughout the long history between the Debtor and the City, the City's course of conduct, at times, fell short of the good faith standard required from a party seeking an equitable remedy.

First, the City's position is that the Debtor willingly entered into the tax trust agreement and subsequently defaulted, and if the Debtor wanted to reassess its taxes it needed only to institute a certiorari proceeding.  However, the City pressured the Debtor into entering the tax trust agreement by conditioning continued lease negotiations on the Debtor entering into the

agreement and consenting to a tax valuation of $3.5 million. Initially, the City represented that the Debtor could continue the tax certiorari proceeding, and, if successful, reduce its tax payment accordingly. Considering that the fair market value of the Property is only $595,000, the Debtor likely would have succeeded in the certiorari proceeding, thereby substantially lowering its tax bill. However, the City then alerted the Debtor that it would be required to terminate the certiorari proceeding before lease negotiations could proceed. Meanwhile, the City's staunch policy against negotiating tax settlements, regardless of the circumstances, eliminated any secondary outlet for the Debtor to relieve its onerous tax burden. Furthermore, the City stalled the Debtor by withholding its signature on the Empire Zone program application. Unfortunately, it was the City that created and perpetuated the very dynamic that made a tax foreclosure sale inevitable. To allow the City to benefit from its conduct toward the Debtor would be inequitable.

Second, the bidding process in the tax foreclosure proceeding and the indicia of favoritism accompanying the City's selection of the local developer suggest a lack of good faith. The City chose to forego its usual methods for conducting an impartial bidding process. Instead, it created a new, qualitative process for this particular Property. Once the tax forfeiture process began and the Property was listed on the City's website, a favored local developer with a building right next door to the Debtor's expressed interest in the Property, which developer was, in the end, selected as the winner. Ben Walsh openly expressed that the City disfavors developers it views as outside speculators and that the Jacobowitzes were seen as such real estate speculators.

Accordingly, the City's pattern of behavior precludes the Court from providing the City equitable relief, and further illuminates the lack of bad faith on the part of the Debtor. Therefore, the City has not met its burden to show cause for dismissal.

### C.  THE CITY'S MOTION TO MODIFY THE AUTOMATIC STAY

Alternatively, the City seeks to terminate the automatic stay, pursuant to 11 U.S.C.

§ 362(d)(1), (2), and (3).

Section 362(d)(1)

Under § 362(d)(1), a creditor may request relief from the automatic stay "for cause,

including the lack of adequate protection of an interest in property of such party in interest." 11

U.S.C. § 362(d)(1).  The movant bears the burden of showing cause. *In re Bogdanovich*, 292

F.3d 104, 110 (2d Cir. 2002); *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999); *In re Sonnax*

*Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).  Adequate protection addresses post-

petition decline in the value of the creditor's interest in the property and is only owed to that

extent. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forrest Assocs., Ltd.*, 484 U.S. 365, 370

(1988).[10]

In this case, the City has not convincingly demonstrated that the value of the Property has

declined since the petition date.  Although a water main broke in the Property post-petition, the

facts of this singular event do not establish that the City's interest in the Property has declined

during the case.  Thus, the City is not entitled to adequate protection payments, and the Debtor's

failure to remit same is not cause for stay relief.

Section 362(d)(2)

Section 362(d)(2) provides that stay relief may be granted as to the debtor's property if

"(A) the debtor does not have an equity in such property; and (B) such property is not necessary

---

[10] If the value of the collateral has declined, adequate protection is owed as of the time the creditor made its motion, rather than from the filing of the petition. *In re Best Products Co., Inc.*, 138 B.R. 155, 157 (Bankr. S.D.N.Y., 1992) ("[This] rule does not reward the creditor for inaction . . . [and] puts the debtor on notice at the time the creditor's motion is filed that at a future point in time the collateral will have to be relinquished or payments will have to be made.").

to an effective reorganization." 11 U.S.C. § 362(d)(2). Here, the Debtor concedes that it does not have any equity in the Property.

Under § 362(d)(2)(B), the debtor bears the burden to demonstrate that "the property is essential for an effective reorganization *that is in prospect*," and that there is "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers of Inwood Forrest*, 484 U.S. at 375–76. The "effective reorganization" analysis implicates the requirements to confirm a plan under 11 U.S.C. § 1129. However, the debtor's burden in the context of § 362(d), to show that a plan is "not patently unconfirmable and has a realistic chance of being confirmed," is lower than the burden at confirmation. *In re 266 Washington Assocs.*, 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992). For the purposes of § 362(d)(2), a realistically feasible plan capable of implementation, as opposed to fanciful, conclusory optimism, may fairly characterize an effective reorganization. *See In re 160 Bleeker St. Assocs.*, 156 B.R. 405, 411 (S.D.N.Y. 1993) (noting that the test for feasibility under § 362(d)(2) is whether the plan can actually be implemented after confirmation); *see also In re Pegasus Agency, Inc.*, 101 F.3d 882 (2d Cir. 1996).

This Court's ruling on the objection to claims informs the feasibility analysis. The City argues that the Debtor proposed the plan for the sole purpose of canceling a tax obligation, and therefore it may not be confirmed under § 1129(d). The City reasons that the Debtor's sole reason for filing the petition was to escape its tax liability, and the plan is merely the vehicle for voiding the City's deficiency tax claim under § 502(b)(3).[11] The Court holds that the

---

[11] The City did not raise the issue of avoiding taxes under § 1129(d) in support of relief from the automatic stay in its initial motion to dismiss. The argument was first made by the City when it objected to confirmation of the Debtor's plan, Objection to Confirmation, ECF No. 126, and soon thereafter reiterated in the City's brief supporting its motion to dismiss, Br., ECF No. 129, although neither of these filings cited to any law other than the statute itself. The argument was again raised in the City's proposed findings of fact and conclusions of law, where only one case was cited in support of its assertion by way of a footnote. Findings of Fact and Conclusions of Law, ECF No. 188. This is unsurprising considering the dearth of case law discussing the interplay between § 1129(d) and § 502(b)(3).

disallowance of taxes under § 502(b)(3) was not the Debtor's sole purpose for filing a

bankruptcy petition, and that § 1129(d) therefore does not render the proposed plan patently

unconfirmable for the purposes of the lift stay motion.

Section 1129(d) provides in pertinent part that:

> on request of a party in interest that is a governmental unit, the court may not
> confirm a plan if the principal purpose of the plan is the avoidance of taxes or the
> avoidance of the application of section 5 of the Securities Act of 1933. In any
> hearing under this subsection, the governmental unit has the burden of proof on
> the issue of avoidance.

11 U.S.C. § 1129(d). Under § 1129(d), the governmental unit has the burden of proving that the

principal purpose of the plan is tax avoidance. *In re Rath Packing Co.*, 55 B.R. 528, 535 (Bankr.

N.D. Iowa 1985). A debtor may still benefit from avoidance of tax liabilities through its plan,

provided that this is not the plan's primary purpose. *See id.*

The City relies on *In re South Beach Securities, Inc.*, 606 F.3d 366, 376 (7th Cir. 2010) to

argue that a plan of reorganization with no purpose other than evading taxes is unconfirmable, as

such a plan does not advance the reorganizational goals of bankruptcy. However, the facts of

that case substantially differ from the case at bar. South Beach Securities was a shell

corporation; its only assets were operating losses against which future tax liabilities might be

offset. *Id.* at 372. The debtor's principal, Mr. Greenblatt, owned the debtor through various other

shell corporations. *Id.* Greenblatt orchestrated a series of transfers to create the appearance that

one of his other solvent corporations was a legitimate creditor of South Beach. *Id.* at 373. He

then filed South Beach's bankruptcy petition for the purpose of paying out "claims" to the

solvent corporation in the form of all of South Beach's stock. *Id.* In effect, Greenblatt planned to

transfer the debtor to the solvent corporation for the purpose of using South Beach's operating

losses to offset the solvent corporation's tax liability, while simultaneously shielding income

from federal taxation by transferring it to South Beach.  The court was not prepared to allow the debtor to use the bankruptcy process for this purpose and denied confirmation of the debtor's plan, which had absolutely no other purpose than dodging taxes. *Id*. at 376.

Here, however, the evidence indicates that the Debtor's purpose for confirming its chapter 11 plan transcends its use of the Bankruptcy Code to resolve its tax burden.  The credible testimony of the Debtor's principal leads the Court to conclude that the Debtor always intended to develop the property.  The Debtor paid $3.5M for the purchase of the Property and has expended significant time and money since its acquisition in furtherance of its goal.  The Debtor has at all times in this case conducted itself in good faith and demonstrated to this Court an honest desire to reorganize and develop the Property.  The Debtor also listed other creditors on its schedules and intends to provide for these claims under its plan.  Although the plan contemplates avoidance of the unsecured portion of the City's tax claim, it is not disallowed by operation of the plan.  Rather, the instant ruling on § 502(b)(3) fixed the City's claim.  A good faith dispute over taxes, which resulted in the disallowance of a portion of the debtor's tax liabilities under § 502(b)(3), does not render the plan unconfirmable under § 1129(d).  The Property is necessary for an effective reorganization, as it is the Debtor's only asset and source of future income, and there is a reasonable possibility that a successful reorganization will occur.  Therefore, the Debtor has carried its burden under § 362(b)(2).

Section 362(d)(3)

Section 362(d)(3) provides that in a single asset real estate case, where the creditor has a lien on the real estate, the debtor must either (A) file a plan within 90 days of filing (unless ordered otherwise) that has "a reasonable possibility of being confirmed within a reasonable time;" or (B) "commence[] monthly interest payments" to the creditor. 11 U.S.C. § 362(d)(3).

The legislature enacted § 362(d)(3) to shorten the duration of single asset real estate cases and prevent a single asset real estate debtor from abusing the bankruptcy process by unduly delaying its case. 3 Collier on Bankruptcy, ¶ 362.07[5][b] (citing S. Rep. No. 168, 103d Cong., 1st Sess. (1993) ("This amendment will ensure that the automatic stay provision is not abused, while giving the debtor an opportunity to create a workable plan of reorganization."); 140 Cong. Rec. 10764 (daily ed. October 4, 1994), reprinted in App. Pt. 9(b) infra (statements of Rep. Brooks, chairperson of the House Judiciary Committee) ("Without bankruptcy reform, companies, creditors, and debtors alike will continue to be placed on endless hold until their rights and obligations are adjudicated under the present system—and that slows down new ventures, new extensions of credit and new investments.")).  Like § 362(d)(2), § 362(d)(3) requires the Debtor to "delineate a credible path to reorganization," and although elements of confirmation are implicated by § 362(d)(3) "a mini-confirmation hearing is not required." *In re RYYZ, LLC*, 490 B.R. 29, 37 (Bankr. E.D.N.Y. 2013).  To the extent that these same issues of feasibility and confirmability are raised by § 362(d)(3), the Court's opinion is unchanged and does not bear repeating.  Because the Debtor timely proposed the plan, stay relief under § 362(d)(3) is not warranted.

D.  CONCLUSION

For all the foregoing reasons, the City's motion to dismiss and alternative request for relief from the automatic stay are denied.  The City's Proof of Claim No. 10 is allowed as a secured claim in the amount of $595,000.  The City's remaining proofs of claim are not disallowed as a consequence of § 502(b)(3).  A separate order will issue.



**Dated: March 31, 2015**
**Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**